UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| GARY R. DAMATO, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:08-CV-01859 (DJS) |
| | : | |
| DEPARTMENT OF CORRECTION, | : | |
| DR. SYED J. NAQVI, DR. | : | |
| TIMOTHY SILVIS, and | : | |
| MCCOUGALL CORRECTIONS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

### MEMORANDUM OF DECISION AND ORDER

The plaintiff, Gary R. Damato, proceeding pro se, brings this action against the defendants, Drs. Syed J. Naqvi and Timothy Silvis, pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to medical need in violation of the Eighth Amendment to the United States Constitution.[1] Jurisdiction exists under 28 U.S.C. § 1331. The defendants now move for summary judgment. For the following reasons, their motion (dkt. # 38) is GRANTED.

### I. BACKGROUND[2]

Damato is incarcerated at the MacDougall-Walker

---

[1] On January 14, 2009, the Court dismissed Damato's comparable claims against the Connecticut Department of Correction and McDougall Corrections. (Dkt. # 5.)

[2] Unless otherwise indicated, the following is drawn from filings related to the motion at bar.

Correctional Institution in Suffield, Connecticut. At all times relevant to this action, Drs. Naqvi and Silvis were employed by UCONN Correctional Managed Health Care ("CMHC"), which provides medical care to inmates at the MacDougall-Walker facility. Dr. Naqvi was, and remains, the primary physician assigned to the main facility, and Dr. Silvis was the primary physician assigned to its expansion unit.

In numerous handwritten submissions to the Court, Damato explains that he suffers from great pain in his right shoulder but has not received appropriate and timely medical treatment from the defendants. In response, the defendants have submitted Damato's medical records, which document the treatment he has received for his many physical and mental health issues.[3] (Dkt. # 39.) With respect to his shoulder pain issue, these reveal what follows.

On June 3, 2004, Damato slipped in the shower and hit his right shoulder. That same day, he was seen by the facility's medical personnel. A note was made to his record indicating that there was no obvious abnormality, but that he experienced discomfort and limited range of motion.

Five days later, on June 8, 2004, x-rays of his shoulder were taken. The resulting radiology report states that "overall

---

[3] Damato's mental health issues include anxiety, depression, and ADHD. While incarcerated, these conditions have been treated with counseling and medications including Paxil, Zoloft, and Wellbutrin (antidepressants).

2

joint alignment" was "satisfactory" and that "structures were intact" but also notes the presence of a "triangular ossified density" that "was probably not of recent origin." With respect to this bone fragment, the radiology report also mentions that "[f]or further localization and evaluation[,] an MRI arthrogram or possibly CT arthrogram would provide additional information."

The next day, on June 9, 2004, Kevin McCrystal — a physician's assistant at the MacDougall-Walker facility — sought authorization from CMHC's Utilization Review Committee ("URC") for an orthopedic consultation regarding the discovered bone fragment.[4] In response, the URC asked for the results of an "objective shoulder examination."

On June 22, 2004, McCrystal performed an objective examination of Damato's shoulder and again sought URC authorization for an orthopedic consultation. The URC denied McCrystal's request, explaining that there was "nothing to be gained by surgical intervention." Instead, the URC recommended daily range of motion exercises and restriction from sports. Throughout the rest of 2004, Damato was seen six more times for complaints of shoulder pain.

Dr. Naqvi first treated Damato for complaints of shoulder pain in December of 2004. Then, he diagnosed Damato with

---

[4] All non-emergency consultations, tests, and treatments delivered to inmates at the MacDougall-Walker facility must be pre-authorized by CMHC's Utilization Review Committee. (Dkt. # 38-4, ¶ 6.)

arthritis and prescribed Motrin (a Non-Steroidal Anti-Inflammatory Drug ("NSAID")) and Flexeril (a muscle relaxant).  He also administered two injections of Depo-Medrol (an anti-inflammatory) directly to Damato's shoulder.  Damato's subsequent treatment generally consisted of Motrin and recommended range of motion exercises.

On February 19, 2005, Damato fell from his bunk and, again, hit his right shoulder.  He also sustained lacerations to his chin for which he was hospitalized.  X-rays were taken at the hospital but revealed no new injury to his shoulder.

Throughout the rest of 2005, Damato was seen ten more times for complaints of shoulder pain.  On April 6, 2005, for instance, McCrystal performed a physical exam which revealed a "slightly decreased" range of motion but no deformity and no "crepitus pain to palpitation."  McCrystal noted that Damato's "[p]ain complaints and medication requests [were] out of proportion to [his] injury," but nonetheless sought URC authorization for an orthopedic consultation to address his complaints.  Again, the URC denied McCrystal's request, explaining that there was "no change in objective findings." Instead, the URC maintained its prior recommendation of daily range of motion exercises, NSAIDs, and restriction from sports and work.

In December 2005, Dr. Naqvi treated Damato for complaints

of shoulder pain a second time. New x-rays of Damato's shoulder were taken, revealing "joint laxity" as well as the protruding bone fragment attributed to a "[p]robable old fracture" which had been observed in June 2004. Dr. Naqvi reviewed these new films and sought URC authorization for an orthopedic consultation, noting Damato's complaints of increased pain and increasingly restricted movement. The URC denied Dr. Naqvi's request. Damato subsequently refused to be seen by Dr. Naqvi. Nonetheless, he continued to complain about shoulder pain and was seen fourteen more times by other medical staff throughout the rest of 2006.

Dr. Silvis first treated Damato for complaints of shoulder pain in January 2006. On May 5, 2006, he sought URC authorization for an orthopedic consultation and an MRI. In so doing, he emphasized the joint laxity observed in Damato's most recent x-ray films. In response, the URC noted that Damato's "complaints continue[d] to be out of proportion to exam findings," but nonetheless indicated that it would consult Dr. Mazzocca — an orthopedic surgeon employed by CMHC — about Damato's care.[5]

Further x-rays of Damato's shoulder were taken on October 4, 2006, on January 8, 2007, and on February 7, 2007. The resulting radiology reports invariably indicate degenerative /

---

[5] Damato's medical records do not show whether Dr. Mazzocca was actually consulted during this period.

5

osteoarthritic changes to the shoulder joint, but find "no evidence of fracture or dislocation." Based on these reports, Dr. Silvis again sought URC authorization for an orthopedic consultation on February 7, 2007. The URC approved his request.

On April 24, 2007, Damato was evaluated by Dr. Mazzocca. Further x-rays of Damato's shoulder were taken on May 21, 2007, and Dr. Mazzocca sought and obtained URC authorization for an MRI and CT Scan, which were both performed on July 18, 2007. These diagnostic tests revealed "no acute fracture or dislocation," but each confirmed the existence of "severe degenerative joint disease" / "severe osteoarthritis" at the shoulder joint.

On October 2, 2007, Dr. Silvis reviewed the results of the tests ordered by Dr. Mazzocca and sought URC authorization for a follow up orthopedic consultation. The URC seems to have initially misunderstood his request. Specifically, the URC initially responded that the "next steps" should be determined "based on review of [the] CT/MRI" imaging performed in July 2007. Dr. Silvis, however, appears to eventually have noticed this misunderstanding by the URC. On February 12, 2008, he renewed his request for a follow up orthopedic consultation, clearly indicating that the prior MRI imaging had already been reviewed and revealed that "several interventions are possible." The URC approved his renewed request.

On March 13, 2008, Damato was again evaluated by Dr. Mazzocca, who subsequently sought and obtained URC authorization for a surgical procedure to repair Damato's shoulder by inserting a prosthetic device. Dr. Mazzocca performed that surgical procedure on June 4, 2008. Over the remainder of 2008, Drs. Mazzocca, Naqvi, and Silvis performed several post-operative follow up examinations and further x-rays of Damato's shoulder were taken.

On December 8, 2008, Damato brought this action alleging that the defendants committed "medical malpractice" and were "deliberately indifferent" to his medical needs. His Complaint seeks "money damages in the amount of 2 million dollars." (Dkt. # 1, p. 8.)

Upon close examination, Damato's submissions to the Court indicate that he is primarily dissatisfied with his inability to obtain specific controlled substances in order to relieve his shoulder pain. Indeed, his submission filed June 29, 2011, argues that his daily pain treatment should specifically include: 125mg of oxycodone / Percocet (an opioid analgesic); 60mg of Flexeril (a muscle relaxant); two Anaflex (an anti-inflammatory); and 3mg of Xanax. (Dkt. # 62, p. 5.) His medical records confirm that he has consistently attempted to secure such specific "stronger medications," as well as codeine (an opiate analgesic), but has not succeeded. In the course of

his treatment, his medical providers have occasionally observed that the Motrin he was given did not sufficiently alleviate his pain, but have also repeatedly found that his specific medication requests were "out of proportion to his injuries."

On July 6, 2006, Dr. Silvis responded to Damato's persistent medication requests by personally performing a full review of his pre-incarceration medical records. He discovered a well-documented history of substance abuse and concluded that Damato should not be treated with controlled substances. (Dkt. # 39, pp. 46-48.) Indeed, Damato's submissions to the Court concede that he has history of "polysubstance abuse to prescription medication." (Dkt. # 29, p. 1.)

Beyond his medication-related complaints, Damato expresses dissatisfaction with the timing of the treatment he received. Specifically, he explains that deterioration in the condition of his shoulder "could have been averted" if the numerous requests for further diagnostic testing had not been denied. (Dkt. # 62, p. 4.) He also expresses dissatisfaction with the results of the surgical procedure performed on his shoulder in June 2008, which he explains has not completely alleviated his pain. (Dkt. # 62, p. 4.) Drs. Naqvi and Silvis now move for summary judgment.

## II. ANALYSIS

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, on a motion for summary judgment, the Court must "determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010). The Court must also determine whether the undisputed material facts, if any, entitle the movant to judgment as a matter of law under the controlling substantive standards. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Kaytor, 609 F.3d at 545.

In making these determinations, "the court should review all of the evidence in the record." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000); Kaytor, 609 F.3d at 545. In so doing, "the court must draw all reasonable

inferences in favor of the nonmoving party, and . . . may not make credibility determinations[,] weigh the evidence," or otherwise "resolve disputed questions of fact." Reeves, 530 U.S. at 150; Kaytor, 609 F.3d at 545. Having fully reviewed the record, the Court finds no genuine dispute of material fact which might preclude the present disposition of this action as a matter of law.

Drs. Naqvi and Silvis argue that they are entitled to judgment as a matter of law on two grounds. First, they argue that the record is inadequate to support Damato's claim of deliberate indifference to a serious medical need. Second, they argue that they are protected by qualified immunity.

"A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care . . . arises from the Eighth Amendment's prohibition of 'cruel and unusual punishment.'" Caiozzo v. Koreman, 581 F.3d 63, 69 (2009) (quoting U.S. Const. amend. VIII). "An inmate attempting to show deliberate indifference must demonstrate that the defendants acted or failed to act while actually aware of a substantial risk that serious inmate harm would result." Farid v. Ellen, 593 F.3d 233, 248 (2010) (citation and quotation marks omitted). But "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an

excessive risk to inmate health or safety," because the "failure to alleviate a significant risk that should have been perceived" does not constitute an "infliction of punishment." Farmer v. Brennan, 511 U.S. 825, 837-38 (1994); Caiozzo, 581 F.3d at 69.

Setting aside the questions of whether an excessive risk to Damato's health actually existed and of whether anyone actually knew of such risk, Damato's medical records conclusively show that his medical providers did not deliberately disregard any such risk by failing to act. From 2004 to 2008, Damato was seen seventy times for complaints shoulder pain (eight visits in 2004, eleven visits in 2005, fifteen visits in 2006, sixteen visits in 2007, and twenty visits in 2008). Throughout this period, he received various treatments and medications, consulted an orthopedic specialist on three separate occasions, obtained diagnostic imaging on eleven separate occasions, and ultimately had a prosthetic device surgically implanted in an attempt to permanently resolve his shoulder pain problem.

Furthermore, Damato's medical records reveal no denial or significant delay in furnishing treatment which can be attributed either to Dr. Naqvi or to Dr. Silvis. To the contrary, his medical records conclusively show that at each visit, Drs. Naqvi and Silvis either personally administered treatment or promptly sought URC approval for further treatment or diagnostic tests.

Finally, Damato's medical records conclusively show that his requests for specific narcotic medications were not met with deliberate indifference to his pain, but rather, were met with medical assessments of the propriety of dispensing such medications in light of the objective findings made by his caregivers and in light of his documented history of prescription drug abuse.

Given these factors, no reasonable juror could conclude that Drs. Naqvi or Silvis deliberately disregarded an excessive risk to Damato's health by failing to act in response to his pain complaints. Damato's Eighth Amendment claim must therefore fail, and accordingly, the defendants' motion must be granted.

### III. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment **(dkt. # 38)** is **GRANTED**. Judgment in favor of the remaining defendants, Drs. Syed J. Naqvi and Timothy Silvis, shall enter on all claims in the complaint. The clerk shall close this file.

SO ORDERED this 30th day of September, 2011.

_____/s/DJS_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**